**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

SOUTH ALEXANDER
DEVELOPMENT I, LLC                                    CIVIL ACTION

VERSUS                                               NO. 23-1436-JWD-SDJ

MARKEL AMERICAN
INSURANCE CO.

<u>**RULING AND ORDER**</u>

This matter comes before the Court on two motions: *Plaintiff's Motion for Partial Summary Judgment Finding that the Defendant Insurer Breached Specific Obligations Under Its Insurance Contract* (the "*MPSJ*") (Doc. 52) filed by Plaintiff South Alexander Development I, LLC ("Plaintiff" or "SADI") and the *Motion for Summary Judgment and Request for Judicial Declaration Regarding Insurance Coverage* (the "*MSJ*") (Doc. 54) filed by Defendant Markel American Insurance Company ("Defendant" or "MAIC"). Both motions are opposed and fully briefed. (Docs. 63, 65, 66, 67.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *MPSJ* is denied, and the *MSJ* is granted.

I.      **Relevant Background**

This case arises from an insurance dispute regarding damage Hurricane Ida allegedly inflicted upon SADI's property. (Doc. 4-1 at ¶ 5.) On August 15, 2023, SADI sued MAIC in the 21st Judicial District Court, Livingston Parish, Louisiana. (Doc. 4-1.) SADI alleged state law causes of action for breach of insurance contract and violation of Louisiana Revised Statutes §§ 22:1892 and 1973. (*Id.* at ¶¶ 21–32.) MAIC removed the case to this Court on October 5, 2023, pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a)(1). (Doc. 1.) SADI and MAIC later

1

filed the motions now before the Court. (Docs. 52, 54.) The parties have alleged the following facts in support of the motions.

SADI owns and operates a solar farm in Springfield, Louisiana. (Doc. 52-1 at 3.) Hurricane Ida caused "significant damage" to SADI's solar farm on or around August 29, 2021. (*Id.* at 4.) During that time, SADI had insurance coverage under the inland marine insurance policy (policy number MKLM4IM0052044) ("the Policy") issued by MAIC. (Doc. 52-2 at ¶ 1.) The Policy specifically covered "renewable energy generating equipment" ("the insured property") against "direct physical loss or damage by a covered peril" (hereinafter, "physical loss"). (Doc. 60-2 at 18, 34.) The Policy also provided coverage, up to $210,000, for the actual loss of energy generating income ("income loss") resulting from a covered physical loss. (*Id.* at 19, 35.)

SADI reported the damage to the insured property to MAIC, and the claim was assigned claim number MXMP76454. (Doc. 52-2 at ¶ 2.) SADI's managing member Ross Reilly ("Reilly") (Doc. 54-2 at ¶ 1) had an initial call with MAIC regarding the claim on September 13, 2021. (Doc. 54-2 at ¶ 4.) MAIC retained Chris Bignon ("Bignon") of Engle Martin and Associates ("Engle Martin") as an independent adjuster. (Doc. 52-2 at ¶ 8; Doc. 54-2 at ¶¶ 6–7.) MAIC also retained engineers to evaluate the extent of the damage, review the repair protocol, and analyze and calculate the insured property's value. (Doc. 52-2 at ¶ 8.) On September 15, 2021, Bignon requested that SADI send him pertinent documents including, among other things, paperwork regarding cost of installation, monthly revenues, and estimates for repairs. (Doc. 54-6 at 1.) After receiving no response, Bignon followed up with SADI on October 21, 2021, and October 26, 2021. (Doc. 54-27 at 5; Doc. 54-28.) SADI responded on October 27, 2021, stating that it would provide MAIC's expert, Michael Pagano of Envista Forensics, with a synopsis of damage the insured

property incurred. (Doc. 54-33 at 2.) On November 1, 2021, SADI, its contractor Joule,[1] Envista Forensics, and Bignon participated in a conference call, after which Envista Forensics emailed a request for information to SADI and Joule. (Doc. 54-7 at 4.) The next day, Joule responded and said it would provide the requested proposals, estimates, and quotes for all work to be performed "as they come in." (*Id.* at 5.)

Joule and Envista Forensics inspected the insured property on November 11–12, 2021. (Doc. 60-8 at 1.) Subsequently, Envista Forensics suggested thermal imaging of the solar array[2] to determine the number of damaged modules. (Doc. 60-8 at 3.) Joule agreed to provide dates for the imaging and the preparatory work, such as removing damaged modules from the array and handling disconnected cables. (*Id.*; Doc. 54-35 at 2.)

Bignon emailed Reilly on December 9, 2021, stating MAIC planned an "additional investigation into the cause of loss" and requesting that SADI neither repair nor remove damaged property "at this time." (Doc. 54-29 at 1.) Bignon also requested a breakdown of SADI's average monthly net profit so he could "set a recommended estimate of loss for the energy generating income loss." (*Id.*) Reilly responded that he would prepare a file for Bignon. (*Id.* at 6.) On December 30, 2021, Bignon informed Reilly that he wanted to send a structural engineer to inspect the insured property on January 5 or 6, 2022, and Bignon asked that the site remain undisturbed in the interim. (Doc. 54-36 at 1; Doc. 60-10 at 128–29.) Bignon also requested an estimated timeframe to prepare the site for infrared testing. (Doc. 54-36 at 1; Doc. 60-10 at 132.) He followed

---

[1] The record makes references to "Joule, LLC" (Doc. 52-1 at 4), "Joule Energy" (Doc. 52-2 at ¶ 9), and "Joule Electric." (Doc. 60-8 at 1.) These names appear to refer to the same entity, so the Court will refer to the entity as "Joule."

[2] A solar array is comprised of modules and purlins. (Doc. 52-2 at ¶ 15, n.17.) A "module" is a solar energy collector mounted to a metal post, and the post is referred to as a "purlin." *Id.*

3

up on January 3, 2022. (Doc. 54-36 at 5; Doc. 60-10 at 132–33.) Reilly indicated that Joule had estimates and a scope of work for the testing and repairs. (Doc. 54-36 at 6; Doc. 60-10 at 134.)

From March 10, 2022, to March 24, 2022, Bignon exchanged emails with Joule and Reilly to confirm that SADI and Joule approved the infrared testing proposal. (Doc. 54-39 at 1–3.) The solar array was inspected on April 18–21, 2022, (Doc. 60-7 at 77) and all parties interested in a potential subrogation claim against the array's manufacturer were invited to attend. (*Id.* at 79.) During the inspection, Joule coordinated the imaging. (*Id.* at 77.) After the inspection, the total portion of the array that was damaged remained in dispute, but it was undisputed that there were 2,017 damaged modules in the array. (*Id.* at 73.) A structural engineer indicated that all the purlins might be damaged and should be examined. (Doc. 60-12 at 2.)

On May 3, 2022, Joule forwarded to SADI a restoration estimate proposal from a third party, but SADI did not share this proposal with Engle Martin or MAIC. (Doc. 54-2 at ¶¶ 51–54.) Bignon wrote to Reilly on May 11, 2022, to outline the information he needed from SADI "to further the adjustment of this claim." (Doc. 54-9 at 1.) Bignon stated he had yet to receive "any labor timesheets or other costs related to Joule Energy's services" or a claim tender from SADI. (*Id.* at 2.) He also indicated that Engle Martin was working with the electrical and structural engineering consultants "to finalize the scope of damage to the solar array" (*Id.*) and that Joule "was planning additional testing to attempt to quantify the total production lost." (*Id.*; Doc. 60-10 at 174.)

Bignon emailed Joule and Reilly on June 14, 2022, to request (1) responses to unaddressed items from a January 3, 2022, request for information; (2) the status of repairs and additional testing of the solar array; and (3) the tender of financial documentation needed to quantify the income loss. (Doc. 54-10 at 2.) Joule responded on June 24, 2022, stating that testing and repairs

4

had not started, and it attached responses to some of the outstanding items in the request for information. (*Id.* at 1.) Bignon sent SADI and Joule an updated request for information on July 20, 2022. (Doc. 54-11 at 1.) Two days later, Joule replied that it would have a response to the request "next week" and that it would "be getting the remaining samples next week as well." (*Id.* at 6.)

On the same day, MAIC sent SADI a letter explaining that MAIC was issuing a net undisputed payment, based on actual cash value ("ACV"), of $1,099,614.02 for the undisputed damage to the 2,017 modules. (Doc. 54-14 at 1; Doc. 60-6 at 1.) The letter also noted 70% of purlins were damaged and required replacement, and additional damage might be discovered during repairs. (Doc. 54-14 at 2; Doc. 60-6 at 2.) Bignon informed Reilly and Joule on August 1, 2022, that SADI could proceed with all necessary demolition, repairs, etc. (Doc. 54-11 at 8.) On August 10, 2022, Reilly forwarded MAIC's July 22 letter to Joule and informed Joule that MAIC "took the liberty to generate their own quote / compensation for handling the cost of repairs" because MAIC did not receive a quote from Joule. (Doc. 54-15 at 1.) Joule responded and included a chart that calculated the "Potential Total Cost of Repair." (*Id.* at 2–3.)

On August 17, 2022, Reilly sent documentation to MAIC to support SADI's income loss claim. (Doc. 54-19 at 3.) On August 18, 2022, Joule emailed Reilly another estimate of the "Potential Total Cost of Repair." (Doc. 54-22 at 2.) The same day, Bignon sent MAIC's expert reports to Reilly and Joule. (Doc. 54-23 at 2.) Bignon followed up on September 7, 2022, requesting confirmation that SADI and Joule received the reports and asking that they let him know if they had any questions. (Doc. 54-42 at 1.) Reilly neither responded nor directed Joule to respond. (Doc. 54-5 at 122.)

In addition to the net undisputed payment, MAIC also paid SADI the income loss policy limits of $210,000. (Doc. 60-7 at 67.) On September 28, 2022, Bignon emailed Reilly that MAIC

approved a policy limits payment for the income loss, and Bignon requested that Reilly confirm he received the reports sent on August 18 and that he let Bignon know if he had questions. (Doc. 54-21.) Reilly did not respond or contact Engle Martin. (Doc. 54-5 at 125–26.) Bignon sent SADI a letter on December 9, 2022, noting both payments MAIC had issued and stating the file for SADI's claim would be closed on January 6, 2022, "if there is no additional information submitted for consideration." (Doc. 54-13; Doc. 60-10 at 270–71.) The letter also instructed, "Please contact the undersigned should you have any questions or concerns." (Doc. 54-13; Doc. 60-10 at 271.) Reilly later testified that SADI "decided to present the true costs at a later date" rather than critique or respond to MAIC's loss payments. (Doc. 54-5 at 147; Doc. 60-10 at 318.) He further testified that SADI made this decision because it felt MAIC was not willing to engage in a good-faith manner with SADI. (Doc. 54-5 at 147–48; Doc. 60-10 at 318–19.) Because SADI did not respond to Bignon's December 9, 2022, letter or inform MAIC of any additional claim pending, MAIC closed SADI's claim in January 2023. (Doc. 60-7 at 66.)

## II. Legal Standards

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

6

However, "the movant 'need not *negate* the elements of the nonmovant's case.'" *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (quoting *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, his "opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## B.    Interpretation of Insurance Contracts

7

Under Louisiana law, "an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." *Advanced Applications Specialists, Inc. v. Aspen Specialty Ins. Co.*, No. 23-01413, 2026 WL 801427, at *3 (M.D. La. Mar. 23, 2026) (quoting *Williams v. Employers Mut. Cas. Co.*, No. 13-499, 2014 WL 2197067, at *2 (M.D. La. May 27, 2014)). "The Louisiana Civil Code provides that '[t]he judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract' by construing words and phrases 'using their plain, ordinary and generally prevailing meaning.'" *Korndorffer v. USAA Cas. Ins. Co.*, No. 22-2035, 2023 WL 2351725, at *7 (E.D. La. Mar. 3, 2023) (quoting *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448–49 (5th Cir. 2014)). Interpreting an insurance contract "generally involves a question of law." *Brouillete v. Liberty Mut. Ins.*, No. 24-1637, 2025 WL 1358973, at *2 (E.D. La. May 9, 2025) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007)).

The court applies the ordinary meaning of the contractual language if the language "is clear and unambiguous and does not have absurd consequences." *Id.* at *3 (citing *Prejean v. Guillory*, 2010-0740 (La. 7/2/10), 38 So. 3d 274, 279). The court must resolve ambiguity "by construing the policy as a whole." *Id.* But the contract "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *Hargiss v. Princeton Excess & Surplus Lines Ins. Co.*, No. 3:22-CV-886, 2024 WL 1743151, at *5 (W.D. La. Mar. 12, 2024) (quoting *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03), 848 So. 2d 577, 580). Therefore, the court is not authorized "to create an ambiguity where none exists or [to make] a new contract when the terms express with sufficient clearness the parties' intent." *Id.*

8

(quoting *Cadwallader*, 848 So. 2d at 580). When determining whether a policy affords coverage for an incident, the insured has the burden to prove the incident falls within the policy's terms. *Id.*

## III.    Discussion

### A.    *MPSJ*

#### 1.    Parties' Arguments

##### a.    Plaintiff's Memorandum in Support (Doc. 52-1)

SADI argues that summary judgment is warranted on the breach of obligation issue because, "based solely upon critical undisputed facts," MAIC failed "to complete the necessary testing and investigation" to fully and fairly adjust SADI's claim. (Doc. 52-1 at 2.) SADI insists the Policy's "Interference and Access" provision "requires the insurer to conduct a sufficient, active investigation." (*Id.* (citing Doc. 60-2 at 27).) The provision's language is unambiguous (*Id.* at 17) and states:

> 1) "You"[3] must minimize any interference with repairs or replacement to avoid or reduce any resulting "interruption."
> 2) "You" must also allow "us"[4] access to covered "renewable energy generating equipment" so that "we" can negotiate with contractors, subcontractors, manufacturers, suppliers, or other involved parties to:
>    a) establish the cause and extent of the loss to covered "renewable energy generating equipment";
>    b) establish the amount of the covered loss; and
>    c) determine and suggest methods to minimize or avoid the "interruption" in the operation of covered "renewable energy generating equipment."

(Doc. 52-1 at 5 (quoting Doc. 60-2 at 27).)

SADI argues the Interference and Access provision creates obligations for both parties. (*Id.* at 5.) SADI must "'minimize interference' and 'reduce any interruption' with repairs and

---

[3] SADI is the "you" in the Policy. (Doc. 52-1 at 5 (citing Doc. 60-2 at 18 (defining "you" as "the persons or organizations named as the insured on the declarations")).)

[4] "We," "us," and "our" refer to "the company providing this coverage," i.e., MAIC. (Doc. 60-2 at 18.)

replacement" and allow MAIC access to the insured property. (*Id.*) And MAIC must conduct the necessary investigation to

> (1) establish the cause and extent of the loss to covered "renewable energy generating equipment;" (2) establish the amount of the covered loss; (3) determine and suggest methods to minimize or avoid the "interruption" in the operation of covered "renewable energy generating equipment;["] and (4) to negotiate with contractors, subcontractors, manufacturers, suppliers, or other involved parties to accomplish each of these mandatory obligations.

(*Id.* at 6 (citing Doc. 60-2 at 27).) MAIC issued a partial payment on July 22, 2022, and closed SADI's claim on January 20, 2023, all without any assessment—after the April 2022 investigation—of the damage to the insured property. (*Id.* at 3.) Additionally, the April investigation was focused on "a potential subrogation action" rather than adjusting SADI's claim. (*Id.* at 17–18.) Thus, MAIC breached its contractual obligations. (*Id.* at 6.)

Additionally, Louisiana law and jurisprudence impose upon an insurer like MAIC a duty of good faith and fair dealing, which includes "a duty to properly investigate the claim." (*Id.* at 16 (citing *Wallace v. State Farm Mut. Auto. Ins. Co.*, 36,099 (La. App. 2 Cir. 6/14/02), 821 So. 2d 704, 710).) An insurer breaches its duty of good faith and fair dealing when, as here, it refuses "to revisit its prior conclusions after receiving contradictory evidence," including expert reports, "that additional inspections and/or testing is required in order to fully evaluate the claim." (*Id.* (citing *Korndorffer*, 2023 WL 2351725, at *9).) MAIC abandoned its duty "throughout the adjustment process in complete disregard" for its experts' findings and recommendations. (*Id.* at 20.) Instead, MAIC shifted its investigative responsibilities to SADI. (*Id.*)

### b. Defendant's Response (Doc. 65)

MAIC responds that the plain language of the Policy contradicts SADI's argument. (Doc. 65 at 19.) The Interference and Access provision relates only to coverage for income loss and creates obligations for SADI, not MAIC. (*Id.*) Because the *MPSJ* does not seek relief with respect

to income loss payment, the arguments under the Interference and Access provision should be disregarded. (*Id.* at 19–20.)

Even if that provision applies to the physical loss coverage, SADI is not entitled to additional payments. (*Id.* at 20.) Based on Engle Martin's recommendation, MAIC issued a net undisputed payment to SADI pursuant to the Policy's physical loss coverage part. (*Id.* at 23–24.) Correspondence informing SADI of the payment instructed SADI to contact MAIC with any questions. (*Id.* at 24.) SADI never asked MAIC questions nor did it submit cost estimates. (*Id.*) MAIC invited SADI to submit additional documentation if further damage was discovered during repairs, but SADI never responded. (*Id.* at 20.) SADI did not incur any costs to repair or replace the insured property, so it did not satisfy the Policy's requirements to recover replacement cost value ("RCV"). (*Id.*) Additionally, SADI has not satisfied the Policy's requirement to seek ACV because "SADI did not make a claim for actual cash value at any time." (*Id.* at 23.)

Moreover, SADI, not MAIC, violated the Interference and Access provision. (*Id.* at 25.) After MAIC issued the net undisputed payment, SADI obtained detailed cost estimates from its contractor, the production of which MAIC had requested for months, and SADI concealed the estimates and ceased all communication with MAIC, despite multiple follow up requests. (*Id.* at 24–25.) SADI, therefore, interfered with the adjustment and repair process and violated the Policy when it withheld and concealed the requested estimates. (*Id.* at 25.) Thus, SADI cannot meet its burden to prove MAIC breached the Policy. (*Id.*)

The *MPSJ* refers to MAIC's "inherent obligations of good faith and fair dealing," but it does not provide any analysis of these obligations. (*Id.* at 25–26.) The *MPSJ*'s arguments on this point must be denied as "fundamentally unsupported." (*Id.* at 26.) Specifically, SADI relies on the *Korndorffer* case for a proposition for which the case does not stand—the *Korndorffer* court "did

not render any opinions concerning insurer conduct, as alleged by SADI." (*Id.*) The *MPSJ* also mischaracterized MAIC's representatives and experts' opinions regarding the value of SADI's physical loss claim. (*Id.* at 27.)

        c.   Plaintiff's Reply (Doc. 66)

SADI argues the only logical interpretation of the Interference and Access provision is that if income loss coverage is provided, MAIC, not SADI, must "establish the cause and extent of the loss" and "establish the amount of the covered loss." (Doc. 66 at 2 (quoting Doc. 60-2 at 27).) SADI asserts that any doubt about this interpretation requires the Court to construe ambiguity in SADI's favor. (*Id.* (citing *Cadwallader*, 848 So. 2d at 580).)

Even without the Interference and Access provision, MAIC had an inherent obligation to adjust SADI's claim in good faith and to deal fairly with SADI as well as a duty to properly investigate the claim. (*Id.* at 3.) MAIC has no good reason why it issued a partial payment and closed SADI's claim "without conducting any further testing, investigation, or assessment of the damage." (*Id.*) MAIC does not explain why it ignored its own experts' "repeated requests and recommendations" to conduct additional investigation and testing. (*Id.* at 3–4.) Thus, MAIC has not created a genuine issue of material fact regarding its breach of contractual and inherent obligations owed to SADI. (*Id.* at 4.)

Additionally, MAIC cannot assert it fulfilled its obligation when it delayed the investigation, prioritized the subrogation claim, and ignored its experts' recommendations to continue investigating and testing. (*Id.*) To protect and support its subrogation claim, MAIC conducted the April 2022 inspection (*Id.* at 5 (citing Doc. 60-7 at 79)) and issued the $1,309,656.15 payment to SADI. (*Id.* at 5–6 (citing Doc. 60-13 at 1–2).) Instead of explaining why MAIC did not complete the testing and investigation its experts recommended, MAIC blames SADI "for failing

to adjust its own claim." (*Id.* at 6–7.) SADI also claims it has incurred repair and replacement costs that used "the vast majority, if not all, of the funds" from MAIC when it purchased "replacement purlins and modules in addition to other repairs related to the tree and fence damage." (*Id.* at 10.)

### 2. Applicable Law and Analysis

#### a. Contractual obligation

SADI first argues that the issue of MAIC's breach of its obligation under the Policy's Interference and Access provision is ripe for summary judgment adjudication. "An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something." La. Civ. Code art. 1756. "A party who demands performance of an obligation must prove the existence of the obligation." La. Civ. Code art. 1831.

The parties both argue that the language of the Interference and Access provision is unambiguous. (Doc. 52-1 at 17; Doc. 65 at 5.) However, both parties offer reasonable, yet opposing, interpretations of the provision. On the one hand, SADI argues the provision imposes obligations on both SADI and MAIC, and specifically, that it obligates MAIC to investigate the claim. On the other hand, MAIC argues the provision creates obligations only for SADI. The Court finds both interpretations to be reasonable, so the Interference and Access provision is ambiguous. *See Hargiss*, 2024 WL 1743151, at *5 (stating a contract is ambiguous if it is susceptible to more than one interpretation) (quoting *Campbell v. Melton*, 2001-2578 (La. 5/14/02), 817 So. 2d 69, 75).

As the movant, SADI has the burden to prove there is no genuine issue for trial by showing that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Here, SADI has not proven that no reasonable

13

juror could find for MAIC. Therefore, SADI has not satisfied its summary judgment burden for the breach of contractual obligation claim.

### b. Statutory obligation

SADI also claims MAIC violated its statutory duty of good faith and fair dealing. (Doc. 52-1 at 15 (citing La. R.S. 22:1973(A)).). SADI mainly relies on *Korndorffer v. USAA Casualty Insurance Company* to support its argument that MAIC failed to conduct a thorough investigation and breached its duty of good faith and fair dealing. (*Id.* at 16, 19–20 (citing *Korndorffer*, 2023 WL 2351725, at *9).) SADI specifically relies on *Korndorffer* for the assertion that "an insurer's refusal to revisit its prior conclusions after receiving contradictory evidence that additional inspections are 'still needed'" to fully evaluate a claim is a breach of its good faith duty. (*Id.* (quoting *Korndorffer*, 2023 WL 2351725, at *9).) The cited portion of *Korndorffer*, however, makes no such conclusion. *See Korndorffer*, 2023 WL 2351725, at *9. The court instead found summary judgment was inappropriate because there was "a genuine dispute of material facts as to whether Defendant acted reasonably or failed to conduct a thorough investigation." (*Id.*) Thus, SADI's reliance on *Korndorffer* is misplaced.

Additionally, SADI seems to argue that MAIC's payment of the alleged undisputed portion of the physical loss breached MAIC's good faith duty and constituted a failure to conduct a thorough investigation. (Doc. 52-1 at 19.) SADI asserts MAIC (1) waited more than seven months after Hurricane Ida's August 29, 2021 landfall to inspect the insured property; (2) conducted the investigation for a subrogation claim rather than for SADI's claim adjustment; and (3) issued payment without further assessment of the damage. (*Id.* at 17–19.) SADI's evidence, however, contradicts these arguments.

14

First, SADI's evidence indicates that MAIC's experts did not wait seven months for an inspection, but instead inspected the insured property on November 11–12, 2021, (Doc. 60-8 at 1) and got SADI's permission for another inspection to occur around January 5–6, 2022. (Doc. 60-10 at 128–29, 134.) Second, though SADI relies on MAIC's claim file to support the assertion that the April inspection was conducted solely for a subrogation claim, that same file discusses the April inspection as a step that would allow MAIC "to define [the] scope of repair and to estimate repair costs." (Doc. 60-7 at 77–78.) The claim file does not indicate the inspection was arranged solely to investigate a subrogation claim.

Finally, the claim file also shows that the net undisputed physical loss payment was issued after an assessment of and calculations based on MAIC's experts' recommendations, costs, and documented damage after inspections. (*Id.* at 73–74.) Additionally, MAIC informed SADI that if damage (beyond the undisputed physical loss covered by the payment) was discovered during repairs, MAIC would analyze the additional damage. (Doc. 60-10 at 228.) Furthermore, MAIC's corporate representative testified that MAIC did not have its experts conduct additional testing because SADI and Joule stopped responding to and cooperating with MAIC. (Doc. 60-1 at 220–21.)[5] The evidence SADI presented to the Court does not show an absence of a genuine dispute as to whether MAIC failed to conduct a thorough investigation or otherwise violated its duty of good faith and fair dealing. Therefore, SADI has not carried its burden to identify sufficient facts that show an absence of a genuine issue of material fact. Accordingly, SADI's *MPSJ* must be denied.

**B.    *MSJ***

---

[5] The Court notes that SADI misrepresented this deposition testimony by claiming, "When questioned as to why Markel did not instruct its own experts and/or consultants to perform the necessary inspections, Markel's corporate representative had no answer, and instead, conceded that she did not know whether those experts had ever requested permission to do so." (Doc. 52-1 at 19 (citing Doc. 60-1 at 221–22).) The record shows, instead, that in response to this inquiry, the representative testified that for MAIC's experts to conduct additional testing, SADI and its expert needed to cooperate, but SADI and its expert stopped responding to MAIC and Chris Bignon, despite "numerous requests" from Chris Bignon. (Doc. 60-1 at 220–21.)

### 1. Parties' Arguments

#### a. Defendant's Memorandum in Support (Doc. 54-1)

In support of its *MSJ*, MAIC argues that summary judgment is warranted because SADI's "documented failure to cooperate and willful concealment of material facts" void coverage under the Policy. (Doc. 54-1 at 10.) MAIC's obligations under the Policy are contingent upon SADI fulfilling its obligations, including its duty to cooperate with MAIC's efforts to adjust the claim. (*Id.*) An insured's failure to cooperate is a material breach of an insurance policy that precludes recovery and warrants dismissal. (*Id.* at 11 (citing *Hamilton v. State Farm Fire & Cas. Ins. Co.* (*Hamilton II*), 477 F. App'x 162 (5th Cir. 2012); *Mosadegh v. State Farm Fire & Cas. Co.* (*Mosadegh I*), No. 07-4427, 2008 WL 4544361 (E.D. La. Oct. 8, 2008)).) Additionally, SADI's willful concealment or misrepresentation of material facts or circumstances related to the Policy or its subject voids coverage. (*Id.* at 10–11.) Under such circumstances, dismissal is warranted. (*Id.* at 12 (citing *Chavez v. Homesite Ins. Co.*, 834 F. Supp. 2d 504 (E.D. La. 2011); *Roach v. Allstate Indem. Co.*, No. 09-1110, 2011 WL 4402575 (M.D. La. Sept. 20, 2011), *aff'd*, 476 F. App'x 778 (5th Cir. 2012)).)

Here, "undisputed evidence and sworn testimony of SADI through Ross Reilly" show SADI concealed material facts regarding its insurance claim, with intent to deceive, so coverage is void. (*Id.* at 13.) Despite MAIC's requests for repair cost estimates, SADI withheld that information for nearly three years. (*Id.* at 13–14.) SADI deliberately and strategically chose not to comply with MAIC's written requests for additional information related to invoices, estimates, and documents regarding the costs to repair the insured property. (*Id.* at 14–15.)

Additionally, the breach of contract claims are unsupported because MAIC has paid the policy limits for the income loss claim, meaning "no other income loss coverage is afforded." (*Id.*

16

at 15–17.) MAIC also issued payment for the undisputed portion of the physical loss, which was consistent with the Policy. (*Id.* at 18 (quoting Doc. 54-4 at 15.) The Policy also dictates that the insured property be valued based on replacement cost value ("RCV") after repairs or replacement occurs. (*Id.* at 17, 21.) MAIC owes no additional payments for physical loss because SADI has incurred no repair or replacement costs. (*Id.* at 16, 19.) And if SADI wanted to recover actual cash value ("ACV"), it needed to make a claim for ACV within 180 days of the loss. (*Id.* at 18 (quoting Doc. 54-4 at 29).) No such claim was made. (*Id.*) Thus, SADI is not entitled to additional payments under the Policy. (*Id.* at 21.)

MAIC also asserts that SADI's bad faith claims should be dismissed because MAIC issued both the undisputed physical loss payment and the loss of income policy limits payment within thirty days of receiving its experts' reports estimating the value of the damages. (*Id.* at 24–25.) Thus, the payments were timely under Louisiana law and the Policy. (*Id.* at 25.) MAIC additionally argues any claim for bad faith damages for acts on or after July 1, 2024, fails as a matter of law. (*Id.* at 26.) MAIC relied on the Policy's terms and conditions and "worked extensively to adjust the subject claim in good faith and with fair dealing." (*Id.* at 27.) "[T]he record is devoid of any evidence that MAIC's conduct was arbitrary, capricious or without probable cause." (*Id.* (citing *Duhon v. State Farm Mut. Auto. Ins. Co.*, No. 2006-1413 (La. App. 3 Cir. 3/7/07), 952 So. 2d 908; *Johnson v. State Farm Mut. Auto. Ins. Co.*, No. 11-1991, 2012 WL 1745497 (E.D. La. May 16, 2012)).) When "there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause." (*Id.* at 27–28 (quoting *Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, No. 2008-0453 (La. 12/2/08), 999 So. 2d 1104, 1114).)

   b.   Plaintiff's Response (Doc. 63)

SADI responds that MAIC's claims that SADI intended to deceive and willfully concealed a material fact are "unsubstantiated and defamatory" accusations based solely on Reilly "failing to forward an email in August 2022 containing projected costs prepared by SADI's solar contractor." (Doc. 63 at 4–5.) The willful concealment argument raises an affirmative defense of fraud, which MAIC waived the right to raise because MAIC did not plead fraud or intent to deceive in its answer. (*Id.* at 6–7.) SADI also asserts that MAIC cannot support such accusations or demonstrate a lack of genuine issues of material fact regarding SADI's intent. (*Id.* at 5.)

SADI withheld information from MAIC not with intent to deceive, but because SADI wanted to get legal advice. (*Id.* at 8 (citing Doc. 63-5 at ¶ 7).) Moreover, Reilly thought the August 2022 calculations "were simply put together to highlight significant mistakes and math errors by MAIC's consultants in calculating the minimal payment it tendered weeks earlier." (*Id.* (citing Doc. 63-5 at ¶ 8).) He did not consider the calculations to be a formal bid to repair the insured property or something MAIC needed to complete a proper investigation because he "knew that additional testing was necessary and forthcoming to prepare more precise estimates." (*Id.*)

"SADI has cooperated in full compliance with the Policy," and "no case supports the harsh relief" MAIC seeks. (*Id.* at 5.) Dismissal for failure to comply with a cooperation clause is appropriate only in "the most egregious circumstances" and only when the insurer can prove actual prejudice. (*Id.* (citing *Kerr v. State Farm Fire & Cas. Co.*, 934 F. Supp. 2d 853, 857–58 (M.D. La. 2012)).) The two-part test to determine if such a dismissal is appropriate is (1) whether the insured can offer a reasonable explanation for noncompliance and if no such explanation is offered, (2) whether the insurer established prejudice. (*Id.* at 5–6 (citing *Beasley v. GeoVera Specialty Ins. Co.*, 2015 WL 2372328, at *4 (E.D. La. May 15, 2025); quoting *Spindel v. Bankers Specialty Ins. Co.*, 2010 WL 5439706, at *2 (E.D. La. Dec. 28, 2010)).) SADI claims its reasons for not forwarding

18

the information to MAIC "are more than reasonable," and that the question of their reasonableness should be left to the trier of fact. (*Id.* at 9 (citing *Beasley*, 2015 WL 2372328, at \*4; *Courville v. GeoVera Specialty Ins. Co.*, No. 21-02191, 2021 WL 4702607, at \*3 (W.D. La. Oct. 7, 2021)).)

Even if SADI's explanations are not reasonable, MAIC still bears the burden to prove prejudice. (*Id.*) MAIC neither pled prejudice in its Statement of Uncontested Facts or the *MSJ* nor submitted evidence of prejudice it claims it sustained due to SADI's delay in producing the August 2022 estimates. (*Id.*) MAIC was not prejudiced because its engineering team confirmed it had all the samples, evidence, and information it needed from the insured property, and the withheld estimates were similar in scope to the cost estimates from MAIC's consultants. (*Id.* at 9–10 (citing Docs. 54-15, 63-9, 63-11, 63-12, 63-22).)

SADI also argues that the cases MAIC relies on regarding dismissal for violation of a cooperation clause are distinguishable. Specifically, unlike the matter at hand, those cases "are based solely on (1) an insured's outright refusal to permit an inspection of the property or sit for a required examination under oath; or (2) an insured's attempt to engage in blatant insurance fraud by making a claim that did not otherwise exist." (*Id.* at 10 (emphasis omitted).)

Regarding the income loss claim, SADI does not dispute the policy limit is $210,000, or that MAIC paid that limit. (*Id.* at 11.) SADI claims these facts do not restrict its claims for bad faith damages for delayed payment and consequential damages for additional lost profits above the policy limit. (*Id.*) Engle Martin assessed the estimated loss of income was $210,000 on September 21, 2021, but MAIC did not pay the policy limits until September 30, 2022. (*Id.* at 11–12 (citing Doc. 63-8 at 1; Doc. 54-1 at 13).) "These facts alone demonstrate that SADI is entitled to bad faith damages due to MAIC's delayed payment" of policy limits. (*Id.* at 12.) SADI also argues Louisiana Revised Statutes § 22:1973(A) "provides that an insurer who breaches the duty

19

of good faith and fair dealing 'shall be liable for any damages sustained as a result of the breach.'" (*Id.*) Because "issues of fact remain as to whether MAIC has breached its duties and obligations," summary judgment is precluded on the consequential damages claim. (*Id.* at 14.)

Regarding the physical loss claim, "SADI concedes that (1) it is entitled to Replacement Cost Values (RCV) *only* when repairs/replacements are made; and (2) it has not yet made any repairs/replacements." (*Id.*) The Policy permits ACV recovery in lieu of RCV, and SADI made a claim for all applicable coverages available under the Policy. (*Id.* at 15.) "MAIC acknowledged that SADI was seeking ACV loss when it issued a partial payment of the loss identified by MAIC as 'ACV Claim - $1,099,614.02.'" (*Id.* (emphasis omitted) (citing Doc. 63-17).)

MAIC's team estimated the total loss at $4,210,000, but "MAIC issued a payment of only $1,096,612.02"[6] toward the physical loss claim. (Doc. 63 at 15–16 (citing Docs. 63-10, 63-11, 63-12).) There is still a dispute as to why MAIC paid this amount when its experts "recommended a loss payment of $4 million as early as December 9, 2021, sufficient to preclude summary judgment." (*Id.* at 16.) SADI claims it has a right to pursue the undisputed portion of the ACV of the loss. (*Id.*) MAIC also acknowledged damage to solar equipment other than modules and purlins, which damage it refused to investigate, quantify, and pay. (*Id.*) This refusal is sufficient to deny the *MSJ*. (*Id.*) SADI also reiterates its arguments made in the *MPSJ*. (*Id.* at 17–19.)

Genuine issues of material fact exist as to whether MAIC adjusted SADI's claims in bad faith. (*Id.* at 20.) MAIC prioritized its subrogation claim over SADI's claim. (*Id.* at 20–21.) MAIC's failure to pay the undisputed amount of damage estimated in its own experts' reports within thirty or sixty days of satisfactory proof of loss was arbitrary and capricious. (*Id.* at 21–22.) MAIC also failed to conduct a proper, active investigation of the claims. (*Id.* at 23.) SADI

---

[6] SADI's dollar amounts regarding the physical loss payment are inconsistent throughout the *Opposition*, but the evidence shows the amount paid to SADI was $1,099,614.02. (Doc. 63-17 at 7.)

additionally contends that the July 1, 2024, amendment of Louisiana Revised Statutes § 22:1892 does not apply to this case. (*Id.* at 25.)

c.    Defendant's Reply (Doc. 67)

MAIC maintains that SADI breached the Policy's conditions to recovery regarding "Cooperation" and "Misrepresentation, Concealment, Or Fraud." (Doc. 67 at 4–5 (citing Doc. 54-4 at 15, 28, 32).) Because the Policy is clear and unambiguous, "its provisions must be enforced as written." (*Id.* at 8.) SADI, as the insured, "bears the burden of proving the claim falls within the policy's terms and conditions." (*Id.* at 5 (citing *Miller v. Superior Shipyard & Fabrication, Inc.*, 2001-2683 (La. App. 1 Cir. 11/8/02), 836 So. 2d 200, 203)).) SADI has not met this burden. (*Id.*)

MAIC argues SADI's *Opposition* relies upon Reilly's self-serving *Declaration* to detract from his prior deposition testimony, and specifically, the *Opposition* downplays SADI's withholding of information as a failure to provide a preliminary estimate. (*Id.*) However, SADI received numerous estimates from Joule throughout the fall of 2022, "including a proposal for re-energizing the facility within months and an 'execution-ready' contract for restoration." (*Id.* (emphasis omitted) (referencing Doc. 54-5 at 241–42, 246, 252, 256, 261; Doc. 54-22; Doc. 54-23; Doc. 54-24; Doc. 54-25).) Despite his *Declaration* otherwise, Reilly testified at SADI's Rule 30(b)(6) deposition that concealing the documentation was deliberate and strategic and "a 'concerted decision' not to present MAIC with the long-requested repair costs and wait until filing suit." (*Id.* at 6 (citing Doc. 54-4 at 290–91, 317–19).) Such conduct violates the "Cooperation" and "Misrepresentation, Concealment, Or Fraud" conditions in the Policy, making coverage void. (*Id.*)

Louisiana courts do not uniformly utilize the two-part test SADI discussed regarding dismissal for failure to cooperate. (*Id.* at 7.) Nevertheless, even under that test, dismissal is appropriate. SADI did not act reasonably when it intentionally concealed estimates that the Policy

required it to produce, gave them to an attorney, and sued MAIC for breach of contract and bad faith penalties. (*Id.* at 6–7 (distinguishing *McCartney v. Shelter Mut. Ins. Co.*, 2017-1398 (La. App. 1 Cir. 7/10/18), 255 So. 3d 1060).) And while MAIC claims it need not show prejudice to prevail on its cooperation clause argument, SADI's breach "has clearly prejudiced MAIC." (*Id.* at 7.) An insurer has a right to information that is relevant to a loss "while the information is fresh," and "an insured's willful refusal or failure to provide information or documentation" relating to the repair cost prejudices the insurer because it "cannot effectuate 'the purpose of the insurance policy.'" (*Id.* (quoting *Hamilton v. State Farm Fire & Cas. Co.* (*Hamilton I*), No. 11-24, 2011 WL 5078963 (E.D. La. Oct. 4, 2011)).) Therefore, "[t]he prejudice is clear." (*Id.* at 8.)

SADI also cannot meet its burden to prove MAIC breached the Policy. (*Id.*) MAIC issued a check for income loss policy limits on September 30, 2022. (*Id.* at 9 (citing Doc. 54-30).) The check was issued after SADI delayed providing documentation to support its income loss claim until August 2022, (*Id.* at 8 (citing Doc. 54-18 at 173–74, 220–25; Doc. 54-19)), and MAIC's expert issued a report on the income loss on September 9, 2022. (*Id.* at 8–9 (citing Doc. 54-18 at 174, 199–200; Doc. 54-19; Doc. 54-20).) MAIC also issued the net undisputed payment for SADI's physical loss claim within thirty days of the June 29, 2022 expert report on this claim. (*Id.* at 9 (citing Doc. 54-31; Doc. 54-30).) SADI admits no repairs or replacements have occurred since this payment and that it is not entitled to RCV until it conducts repairs or replacement. (*Id.* at 9–10.) Thus, both payments were issued in compliance with the Policy and Louisiana law. (*Id.* at 9.)

Additionally, "SADI has not demonstrated a single element" for its bad faith claim regarding causes of action that accrued before July 1, 2024. (*Id.* at 10.) Moreover, SADI does not dispute that it did not comply with Louisiana Revised Statutes § 22:1892.2 for any bad faith claims that accrued on or after July 1, 2024. (*Id.* at 10–11.) SADI's arguments for additional ACV

22

payments "are an utter mischaracterization of the evidence." (*Id.* at 12.) Contrary to SADI's assertions, Bignon testified that his only payment recommendation to MAIC regarding the physical loss claim was in his July 6, 2022, report and that other estimates of loss in his reports were only "a rough order of magnitude." (*Id.* (citing Doc. 54-18 at 27).) "Accordingly, SADI's reliance on these figures is inappropriate, misleading, and insufficient to defeat MAIC's fully-supported Motion." (*Id.*) Furthermore, "MAIC acted in good-faith reliance" on the Policy when issuing the net undisputed payment, so even if additional payments are owed for the physical loss, the bad faith claim should be dismissed. (*Id.* at 11.) MAIC also complied with the Policy, which provides that if "there is a dispute regarding the amount of the loss, 'we' will pay any undisputed portion of the claim within 30 days after a satisfactory proof of loss is received. Any additional amount due will be payable after the amount of the loss has been established either by written agreement with 'you' or the filing of an appraisal award with 'us.'" (*Id.* at 11–12 (quoting Doc. 54-4 at 15).) SADI also "falsely claims" MAIC prioritized its subrogation claim above SADI's interest, despite the deposition testimony of MAIC's corporate representative that MAIC diligently worked on SADI's claim and pursued the warranty claim against the array's manufacturer to get money for SADI's benefit. (*Id.* at 12–13.) Summary judgment is warranted.

## 2.    Applicable Law and Analysis

MAIC argues SADI's "failure to cooperate and willful concealment of material facts constitute material breaches" of the Policy and void coverage. (Doc. 54-1 at 10.) Under Louisiana law, "[c]ontracts have the effect of law for the parties." La. Civ. Code art. 1983. The parties' agreement under the Policy was that SADI would pay the premium in exchange for insurance coverage from MAIC, which coverage was subject to all the "terms,"[7] the schedule of coverage,

---

[7] "'Terms' means all provisions, limitations, exclusions, conditions, and definitions that apply." (Doc. 54-4 at 34.)

23

and additional conditions in the Policy. (Doc. 54-4 at 19.) Therefore, SADI was required to satisfy the "terms" for the Policy to afford coverage.

The "terms" relevant to the Court's analysis are the Cooperation clause and the Proof of Loss clause. The Cooperation clause provides, "'You' must cooperate with 'us' in performing all acts required by this policy." (*Id.* at 28.) As for proof of loss, SADI was required to give "a signed, sworn proof of loss." (*Id.* at 14.) This proof of loss "must include," among other things, "estimates, specifications, inventories, and other reasonable information that [MAIC] may require to settle the loss." (*Id.* at 15, 27–28.)

### a.   Failure to cooperate

"Louisiana law teaches that failure to fulfill policy requirements that are conditions precedent to an insurance contract precludes suit under the policy." *Mosadegh v. State Farm Fire & Cas. Co.* (*Mosadegh II*), 330 F. App'x 65, 66 (5th Cir. 2009) (citing *Lee v. United Fire & Cas. Co.*, 607 So. 2d 685, 688 (La. App. 4 Cir. 1992); *Robbert v. Equitable Life Assur. Soc.*, 46 So. 2d 286 (La. 1949)). "Accordingly, an insured's failure to cooperate with the insurer and to fulfill his obligations under the policy may be asserted as a material breach and a defense to suit." *Marcantel v. State Farm Fire & Cas. Co.*, No. 2:22-CV-01511, 2024 WL 3157598, at *2 (W.D. La. June 24, 2024) (citing *Spindel*, 2010 WL 5439706, at *2). A refusal to produce documents is an example of a failure to cooperate. *Hamilton II*, 477 F. App'x at 165.

The Court notes that Reilly states in his *Declaration*, "I intended to and did work cooperatively with MAIC and their consultants from the very beginning of SADI's insurance claim." (Doc. 63-5 at ¶ 4.) This singular statement is the only evidence of cooperation that SADI offers to the Court. And the statement is conclusory, i.e., it "express[es] a factual inference without stating the underlying facts on which the inference is based," and therefore, is inadequate summary

24

judgment evidence. *Rodriguez v. Sam's West, Inc.*, No. 23-CV-150, 2024 WL 719879, at *4 (W.D. Tex. Feb. 21, 2024) (indicating that statements are inadequate when "they are vague, conclusory, or lack a foundation in personal knowledge") (quoting *Conclusory*, BLACK'S LAW DICTIONARY (11th ed. 2019); citing *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 392 (5th Cir. 2020) (Ho, J., concurring); *Dallas/Ft. Worth Int'l Airport Bd. v. INET Airport Sys., Inc.*, 819 F.3d 245, 253 n.14 (5th Cir. 2016)).[8] The evidence in the record contradicts Reilly's conclusory statement and shows SADI did not cooperate with MAIC's investigation of SADI's claim.

MAIC's corporate representative testified that SADI did not provide documentation MAIC requested during the investigation of SADI's claim and that SADI also failed to respond to "numerous emails asking for this information." (Doc. 63-3 at 15.) Specifically, from September 2021 through at least July 2022, MAIC, Engle Martin, and MAIC's experts made numerous requests to SADI for information on costs incurred; documentation supporting the income loss claim; quotes, estimates, and proposals for repairs to the insured property; a scope of the work for testing and repairs; and other pertinent documents. (Doc. 54-6 at 1; Doc. 54-29 at 3; Doc. 54-37; Doc. 54-36 at 5–6; Doc. 54-41; Doc. 54-10 at 2; Doc. 54-11 at 1, 11–14.) These requests went largely unanswered. (Doc. 54-5 at 22; Doc. 54-10 at 1–2 (failing to address request for estimates); Doc. 54-12 (same).) And SADI did not send information supporting the income loss claim until August 17, 2022, (Doc. 54-19 at 3) despite requests for such information beginning on September 15, 2021. (Doc. 54-6 at 1.) SADI's own evidence shows SADI said it would provide this information but continuously failed to do so until August 17, 2022. (Doc. 63-8 at 7 (September 15,

---

[8] MAIC claims Reilly's *Declaration* is "an utterly unsupported attempt to deflect from his own deposition," which the Court interprets as an invocation of the sham affidavit doctrine. (Doc. 67 at 5.) *See Rodriguez v. City of Corpus Christi*, 129 F.4th 890, 897 (5th Cir. 2025) (stating the "sham affidavit doctrine" allows a district court to disregard statements in an affidavit that are markedly inconsistent with prior testimony). Because the Court's issue with the above-quoted statement is its conclusory nature, not whether it is consistent with prior testimony, the sham affidavit doctrine is inapplicable to this issue, and the Court need not address it.

2021 report from Engle Martin stating that Reilly advised he would provide information supporting the income loss claim); Doc. 63-9 at 9 (December 9, 2021 report stating that Reilly "committed to providing a projected [income] loss amount"); Doc. 63-11 at 5 (July 6, 2022 report noting that no documents supporting the income loss claim had been received).)

Additionally, though SADI received estimates and proposals for the repairs in May and August 2022 (Doc. 54-40; Doc. 54-15; Doc. 54-22; Doc. 54-25), the evidence indicates that none of these estimates or proposals were shared with MAIC prior to this litigation. (Doc. 54-2 at ¶¶ 53–54; Doc. 54-5 at 111, 113.) Reilly also admitted in his *Declaration* that he did not forward cost estimates to MAIC. (Doc. 63-5 at ¶¶ 7–9.) Furthermore, Reilly testified that, as far as he was aware, SADI did not submit a completed proof of loss to MAIC. (Doc. 54-5 at 80, 104–05, 127.) The Policy, however, requires SADI to submit a proof of loss, including estimates and "other reasonable information" MAIC may need to settle the loss. (Doc. 54-4 at 27–28, *as amended by* Doc. 54-4 at 14–15.) And the Policy further mandates that SADI "must cooperate with [MAIC] in performing all acts required by this policy." (*Id.* at 28.) The evidence, therefore, shows that no reasonable jury could conclude that SADI cooperated with MAIC's efforts to obtain documentation and information meant to aid MAIC's evaluation and settlement of SADI's claim. Accordingly, there is no genuine issue of material fact relating to SADI's breach of the Policy's Cooperation clause.

### b.  Dismissal is appropriate

Cooperation clauses enable an insurer "to obtain relevant information concerning the loss while the information is fresh." *Patureau v. State Farm Fire & Cas. Co.*, No. 24-299, 2025 WL 2886679, at *14 (M.D. La. Sept. 11, 2025) (quoting *Morris v. State Farm Fire & Cas. Co.*, 740 F. Supp. 3d 491, 500 (W.D. La. 2024)). Such a clause, however, "is emphatically not an escape hatch

26

that an insurer may use to flee from liability." *Id.* (quoting *Dennis v. Allstate Ins. Co.*, No. 10-795, 2010 WL 11538607, at *3 (E.D. La. Aug. 20, 2010)). The "breach of a cooperation clause must be material and prejudicial" for the insurer to be relived of liability. *Id.* (quoting *Dennis*, 2010 WL 11538607, at *3). The insurer must also "show a diligent effort to obtain [the requested] information." *Id.* (brackets in original) (quoting *Wells v. State Farm Fire & Cas. Co.*, No. 13-120, 2013 WL 6044371, at *4 (E.D. La. Nov. 14, 2013)).

The evidence reviewed above shows that MAIC diligently attempted to obtain the documentation and information from SADI and its contractor Joule and that SADI did not cooperate with MAIC. SADI did not comply with the Policy's requirements that it provide a signed, sworn proof of loss or that it cooperate with MAIC. The requested information was material to MAIC's claim investigation because it included invoices, estimates for repairs, and other documentation quantifying the claimed losses.

Though the *MSJ* did not explicitly argue that MAIC was prejudiced by SADI's acts, MAIC has shown it was prejudiced "under the facts and circumstances of this case." *Kerr*, 934 F. Supp. 2d at 861. First, MAIC quotes the Fifth Circuit's finding in *Hamilton II* that the insurer's investigation clearly "was prejudiced" by the insureds' failure to cooperate. (Doc. 54-1 at 11 (emphasis omitted) (quoting *Hamilton II*, 477 F. App'x at 166).) Second, MAIC argues that SADI withheld information that MAIC requested, which information would have aided in the proper resolution of SADI's claim, and then SADI sued MAIC for failing to issue adequate payments. (*Id.* at 14–15.) Third, in response to the *Opposition*'s argument that MAIC failed to plead or submit any evidence suggestive of prejudice (Doc. 63 at 9–10), MAIC argues on *Reply*[9] that it was not

---

[9] Though courts generally refuse to consider arguments raised for the first time on reply, "the Court has discretion to consider new arguments raised in the reply depending on the circumstances of the case." *Pullen v. St. Gabriel Health Clinic Inc.*, No. 25-52, 2026 WL 499596, at *17 (M.D. La. Feb. 23, 2026). The situation the general rule is meant to

27

required to show prejudice to prevail. (Doc. 67 at 7.) The *Reply* claims, "SADI's material breach of the policy has clearly prejudiced MAIC" because "an insurer has the right to 'obtain relevant information regarding a loss while the information is fresh.'" (*Id.* (quoting *Mosadegh I*, 2008 WL 4544361, at \*4).) Furthermore, an insured's "failure to provide information or documentation" regarding the cost of repair "causes the insurer to be 'prejudiced by the material breach of the policy' because they cannot effectuate 'the purpose of the insurance policy' where the insured is blocking or withholding information that the 'insurer needs to fulfill the policy at issue.'" (*Id.*)

SADI's decision to withhold the requested information prejudiced MAIC by depriving it of "the right to properly and thoroughly investigate the claim." *Paige v. State Farm Fire & Cas. Co.*, No. 19-190, 2020 WL 7233596, at \* 5 (M.D. La. Dec. 8, 2020) (stating that an insurer is materially prejudiced when it is deprived of this right due to the insured's failure to cooperate despite the insurer's diligent efforts). *See Kerr*, 934 F. Supp. 2d at 861 (stating an insurer was deprived of this right when the insureds failed to submit to an examination under oath); *Marcantel*, 2024 WL 3157598, at \*3 (finding an insurer was prejudiced and "deprived of the opportunity to adequately investigate the claim" when the insured did not preserve evidence or provide adequate documentation). In sum, instead of aiding MAIC's claim adjustment process, SADI chose to withhold information that the Policy required it to produce and then sued MAIC for breach of the Policy. There is no genuine issue of material fact regarding the prejudice to MAIC.

SADI's failure to cooperate was a failure to comply with the Policy's "coverage terms," so coverage under the Policy is void. (*See* Doc. 54-4 at 19 (stating coverage is subject to the Policy's

---

prevent—i.e., the unfairness that arises when a completely new issue is raised on reply and leaves the opposing party without an opportunity to respond—is not present when the new issue was raised in the opposition brief and then addressed in the reply. *See U.S. v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009) (discussing same in the context of appellate briefs). Therefore, because the *Reply*'s prejudice argument was responding the *Opposition*'s argument on the issue of prejudice, the Court considers the argument raised in *Reply*.

"terms"); Doc. 54-4 at 17 (indicating SADI's "insurance may be void because of [SADI's] acts, neglect, or failure to comply with the coverage 'terms.'").) *See Marcantel*, 2024 WL 3157598, at *2 (asserting an insured's failure to cooperate and fulfill its policy obligations may be a material breach); *Lee*, 607 So. 2d at 688 ("failure to cooperate voided the contract") (quoting *Stover v. Aetna Cas. and Sur. Co.*, 658 F. Supp. 156 (S.D. W.Va. 1987)). SADI, therefore, is precluded from bringing a breach of insurance contract claim against MAIC, so that claim must be dismissed. *See Mosadegh II*, 330 F. App'x at 66 (stating that suit under an insurance policy is precluded by the insured's failure to fulfill policy requirements that are conditions precedent to the policy). Additionally, without a valid contractual claim, SADI's bad faith claim also fails and must be dismissed. *Marcantel*, 2024 WL 3157598, at *3 (citing *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 363 (5th Cir. 2010)).

## IV.   Conclusion

Accordingly,

**IT IS ORDERED** that *Plaintiff's Motion for Partial Summary Judgment Finding that the Defendant Insurer Breached Specific Obligations Under Its Insurance Contract* (Doc. 52) filed by Plaintiff South Alexander Development I, LLC is **DENIED**.

**IT IS FUTHER ORDERED** the *Motion for Summary Judgment and Request for Judicial Declaration Regarding Insurance Coverage* (Doc. 54) filed by Defendant Markel American Insurance Company is **GRANTED**. Consequently, all claims filed by Plaintiff South Alexander Development I, LLC are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on June 24, 2026.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

29